JASON M. FRIERSON
United States Attorney
District of Nevada
Nevada Bar Number 7709
STEVEN ROSE
Nevada Bar Number 13575
JEAN N. RIPLEY
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
Steven.Rose@usdoj.gov
Jean.Ripley@usdoj.gov

*Attorneys for the United States*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> KENTON HARDY KING, <br><br> Defendant. | Case No. 2:20-cr-00344-JAD-DJA <br><br> **Government's Response to Defendant's Sentencing Memorandum (ECF No. 212)** |

Certification: This response is timely filed.

**INTRODUCTION**

In June 2020, defendant Kenton King met a fifteen-year-old child online, and in less than 36 hours, demanded Child Sexual Abuse Material (CSAM) from her, picked her up from her mother's house because she was too young to drive, made her blindfold herself, drove her to his home, had sex with her, videotaped it, ejaculated on her face, made her clean herself up, drove her back to her mother's house, then used the videos and images he took as blackmail to force her to produce additional CSAM and provide him with CSAM from other teenagers. In June 2024, King's case went to trial, and his victim, H.S. recounted

for the jury everything King put her through. The jury found King guilty of coercion and enticement, sexual exploitation of children, and possession of child pornography.

To reflect the seriousness of the crime, provide just punishment, and afford adequate deterrence, the government respectfully requests that the Court impose an aggregate sentence of 292 months imprisonment followed by lifetime supervised release.

## FACTUAL BACKGROUND

On June 2, 2020, H.S. was a 15-year-old child. ECF No. 212 ¶ 6. H.S. went onto Omegle, an online platform that allowed users to communicate with strangers. *Id.* at ¶ 7. Although users could be matched based upon topics or interests input by the user, H.S. testified that she simply put in the term "Las Vegas." She spoke with five or six people that day, the last of whom was King. *See id.* H.S. testified at trial that her conversation with King on Omegle was normal conversation and after approximately 20 minutes, switched to communicating with King via text-message and voice-call. After learning H.S.'s name, King asked her for a picture. Gov't Trial Exhibit 5, at page 2 (bates 579). King inquired where H.S. lived, then immediately asked "[w]hat have you done before[?]" *Id.* Shortly thereafter, King called H.S., saying "I want you to understand what I expect." *Id.* H.S. testified that during that phone call, King talked about owning her, selling her, and his expectation that she call him "master."[1]

---

[1] The final PSR contains a description of the early conversation between King and H.S. that is different than what is in the draft PSR. *Compare* ECF No. 209 ¶ 7 *with* ECF No. 212 ¶ 7. The final PSR says, "[t]estimony during the trial provided by H.S. (cross-examination) indicated the defendant engaged in sexual fantasy role-play and foreplay. . . ." ECF No. 212 at ¶ 7. Although the transcript of H.S.'s testimony is not currently available to the government, the government's recollection does not reflect any statements that H.S. thought that this was a fantasy, or that King was simply acting out a fantasy. Part of King's theory of defense was that his interactions with H.S. were simply a role-play, however H.S. could not testify as to what King was thinking when he made his statements, and the government's understanding is that H.S. did not testify as is described in the final PSR.

Immediately following the phone call, King messaged H.S., "Good whore / I have your first task / Take off all your clothes, go to the bathroom and take a full head to toe selfie. No bra no panties. Maybe [sic] sure I can clearly see your face."[2] *Id.* After H.S. sent King a picture that satisfied his demand, King responded, "More pics / Show your tits / Face visible." *Id.* at p.3. After H.S. sent the required photos, King gave her additional tasks, describing specifically what he wanted her to do. *Id.* His demands were interspersed with comments such as "Remember you don't get to say not [sic] to me[.]"[3] *Id.* at p.4.

King asked H.S. if she had accounts with Facebook, Twitter, or Instagram, and when he learned that she only had a Snapchat account, demanded to know that account's information. *Id.* at 4-5. King told H.S. "I plan on renting you out as well. Teen sluts like you can make me serious bank," and "I got [sic] 100% of the money. You just whore yourself out for me." *Id.* at 5. King told H.S., "I demand nothing but obedience from you whore," and "I own you." *Id.*

King later asked H.S. for H.S.'s mother's name and phone number. *Id.* H.S. responded, "I can't do that one thing. She'd press charges if she ever found out. I'm not risking that." *Id.* at 6. This was the first instance in the text messages where H.S. failed to do as King demanded. King's immediate response was, "Then if you ever disobey me I will just print the photos you've sent me and drop them off at your house / Is that understood / So you understand that saying no will not be in your best interest." *Id.* King continued the threats, "Fall out of line just once and you're [sic] mother sees the pictures." *Id.*

---

[2] The / mark denotes the end of a message as not every message ended with a punctuation mark.

[3] The trial exhibit displayed a symbol in every instance when an apostrophe would have been used. For ease, the government is using the apostrophe rather than the symbol in the printed exhibit.

King told H.S. to download Tinder, which testimony revealed was a dating application used, among other things, for short term relationships. *See id.* After H.S. told King that she could not put Tinder on her phone without her mother finding out, King told her he would give her an old phone of his. *Id.* In exchange, King demanded a video of H.S. inserting a finger into her rectum and then licking the finger. *Id.* When King did not like H.S.'s "tone" in her response, he said, "I guess I'll make a trip to the printer then," referring to his threat to print out the nude photographs H.S. had sent him. *Id.*

King later asked H.S. about her friends and whether her friends knew about H.S.'s sexual life. *Id.* King then demanded a picture of H.S.'s friends, and said, "Give me your best friends full name and number[.]" *Id.* King then used the information H.S. had provided him against her, telling her "Beg me not to send the pics to them[.]" *Id.* at 7. When H.S. begged him not to send the pictures, King responded, "Ok slut. I'll hold off for now. But I expect the best blowjob you've ever given tonight[.]" *Id.* King further used H.S.'s friends as a threat, saying, "Which friend do you want me to send them to first? I'm thinking S[], then t[], then c[] / … / Come up with a punishment for yourself and let me know what it is. If I think it's good enough maybe I'll keep the pics to myself." *Id.* at 8.

King returned to the idea of trafficking H.S., asking if she had ever been on Doublelist, which testimony described as a website where individuals could post messages including commercial sex advertisements. *Id.* King then told H.S. that everything she made would "go to" him, that she was "going to be giving [King] $200 a week minimum." *Id.* King said that anything under his $200 threshold would result in him exposing H.S., and gave her a deadline of June 9th to get him the first $200. *Id.*

King gave H.S. "one more task." *Id.* King demanded a "full body nude photo" of one of H.S.'s friends. *Id.* He specified that the photo must be "No clothes with face fully

visible / If it's not exactly like that you get exposed." *Id.* at 9. King required updates about H.S.'s efforts to obtain a nude photo from one of her teenage classmates, ultimately giving her a 20-minute deadline otherwise he would expose her. *Id.* King's threats to expose H.S. continued, as he sent her a message "Good slut. If you obey me your nudes will stay with me. Disobey me even slightly and you will be exposed." *Id.* at 10.

Because of King's demands for money, H.S. told him that she had found a commercial sex buyer who was willing to pay $30 or $40 for sexual contact with her. *Id.* at 11.[4] King then asked where H.S. attended high school, and H.S. told him what school she attended and that she was a freshman. *Id.*

After H.S. returned from dance class, King drove to H.S.'s mother's house. ECF No. 212 at ¶¶ 9-10. King made H.S. put on a blindfold and told her to remove her clothing and masturbate as he drove. *Id.* at ¶ 10. King drove H.S. to his home, made her enter the house naked and proceed up the stairs to his bedroom. *Id.* King told H.S. to get onto her knees, and then made her perform fellatio on him. *Id.* at ¶¶ 11-12. King made H.S. perform fellatio for approximately 15 minutes, during which he grabbed her hair, forced her head up and down on his penis and nearly caused her to vomit multiple times. *Id.* at ¶ 12. King used his phone to record H.S. performing fellatio, including telling her to state her name and her high school.

King then moved H.S. to his bed, where he stood behind her and vaginally penetrated her. *Id.* at ¶ 13-14. King used a flyswatter to smack H.S. and used his phone to record the encounter. *Id.* King then told H.S. to kneel on the floor and said he would "paint [her] face." *Id.* at ¶ 14. King ejaculated on H.S.'s face, then told her to clean herself. *Id.* King

---

[4] H.S. testified at trial that she had not actually found a commercial sex buyer and was instead planning to get the money from her mother.

drove H.S. back to her mother's residence, dropping her approximately half a block from her mother's house. *Id.*

The next day, King continued texting with H.S. Govt's Trial Exhibit 5 at 13. When H.S. said that she could not return to King's house that night because of her mother, King responded, "Again, this is your problem slut. Not mine. I can find more sluts and plan to anyway. You still owe me 200 a week and nudes of your friends." *Id.* King proceeded to threaten to send H.S.'s nude images to her friends, and sent her a screenshot of what he would send her friends. *Id.* at 14. King demanded a picture of H.S. inserting her finger into her rectum, saying that he would disseminate her images if she did not comply within five minutes. *Id.* After she sent him the requested images, King told H.S., "I want you to know that you're a fat cow that's only usable to pleasure men / You're lucky I even gave you the pleasure of fucking you / … / Just keep sucking my cock and make me my money cow / Even fat cows can still be useful[.]" *Id.*

King then told H.S. she would receive codes texted to her. *Id.* at 14-15. She was directed to provide them to King, then delete them. *Id.* H.S. testified that these codes were activation codes for websites and applications such as Tinder. As he was doing this, King told H.S., "Good. I'm going to be recruiting more slaves. / … / I'm busy looking for other girls to blackmail[.]" *Id.* at 15. King also continued his threats of exposing H.S.'s nude images, telling her he was on his way to her house to drop off the photographs. *Id.* Near the end of the conversation, King told H.S., "I'm domming you. But I won't ruin your life as long as you play ball. So apologize." *Id.* at 17.

When H.S.'s mother discovered the messages that had not been deleted, she took H.S. to the police station. There, H.S. disclosed what had occurred. Henderson Police were able to determine an approximate location where H.S. had been taken and drove to King's

address. Officers spoke with King, and ultimately determined that he was the suspect because he matched the description given by H.S., his shoes appeared in some of the CSAM images seen on H.S.'s phone, and because when they called the phone number used by the man H.S. was talking to, a phone rang in King's pocket. King was "initially evasive" in his interview. ECF No. 212 at ¶ 19. Ultimately, he admitted to meeting someone on Omegle, texted with that person, and engaged in sex with her. *Id.* King admitted that he had created a Tinder account with H.S.'s photos so he could solicit women to have sex with H.S. *Id.* King claimed he thought H.S. was 18 because she was "tall." *Id.* Officers found 31 images and six videos constituting CSAM depicting H.S. on King's phones. *Id.*

**PROCEDURAL BACKGROUND**

On December 15, 2020, a federal grand jury returned a four-count Indictment charging King with Coercion and Enticement in violation of 18 U.S.C. § 2422(b), Sexual Exploitation of Children in violation of 18 U.S.C. § 2251(a) and (e), Attempt Sex Trafficking of Children in violation of 18 U.S.C. §§ 1591(a), 1591(b)(2), and 1594(a), and Possession of Child Pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2). ECF No. 1.

On March 14, 2023, King filed a motion to suppress evidence recovered from his cell phones. ECF No. 74. The government filed a response on March 27, 2023. ECF No. 78. After King filed a reply, ECF No. 82, on July 17, 2023, Magistrate Judge Albregts issued a Report and Recommendation (R&R) recommending granting King's motion to suppress evidence obtained from his cell phones. ECF No. 88. Both King and the government filed objections to the R&R, ECF Nos. 93, 94, and responses to the other party's objections. ECF Nos. 95, 96.

On November 16, 2023, this Court remanded the case to the magistrate judge for further findings and rulings based upon information contained in an affidavit attached to the government's objections. ECF No. 97. On December 21, 2023, Magistrate Judge Albregts issued an R&R that recommended denying King's motion to suppress evidence obtained from his cell phones. ECF No. 100. King filed objections on January 4, 2024, and the government filed its response to those objections on January 17, 2024. An evidentiary hearing was held on May 7, 2024. ECF No. 117. Following that hearing, the Court ordered supplemental briefing. ECF Nos. 117, 120 at 96-97. King filed his supplemental brief on May 16, 2024. ECF No. 125. The government filed its supplemental brief on May 24, 2024. ECF No. 137. This Court overruled King's objections and denied the motion to suppress on June 11, 2024. ECF No. 161.

On May 20, 2024, King filed a motion seeking to introduce evidence pursuant to Rule 412 of the Federal Rules of Evidence and replied to the government's response to his motion. See ECF Nos. 128, 151, 164, 171, 174. After a hearing, the motion was granted in part and denied in part. ECF No. 175.

On June 18, 2024, King's jury trial began. At the close of the government's case, King moved under Rule 29 of the Federal Rules of Criminal Procedure for a Judgment of Acquittal on all counts. See ECF No. 188. This Court denied the motion after hearing the government's response and a reply by King. *See id*. After King rested his case on June 24, 2024, he again moved under Rule 29 for a motion of acquittal on all counts. The government responded, and this Court denied the motion. *See* ECF No. 192. That same day, the parties delivered closing arguments, during which King sought an acquittal on all counts. *Id.* On June 25, 2024, the jury found King guilty of Coercion and Enticement in violation of 18 U.S.C. § 2422(b), Sexual Exploitation of Children in violation of 18 U.S.C.

§ 2251(a) and (e), and Possession of Child Pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2), and not guilty of Attempt Sex Trafficking of Children in violation of 18 U.S.C. §§ 1951(a), (b)(2) and 1954(a).

On October 8, 2024, the United States Probation Office (USPO) disseminated a draft Presentence Investigation Report (PSR). ECF No. 209. The draft PSR recommended a sentence of 292 months imprisonment to be followed by 20 years of supervised release.[5] *Id.* at ¶ 102. The PSR contained a section which described King's mental and emotional health. *Id.* at ¶¶ 55-60. The USPO did not identify any factors that would warrant a sentence outside the advisory guidelines. *Id.* at ¶ 98. On October 17, 2024, King's counsel emailed the Probation Officer who drafted the PSR, and counsel for the government, with 11 objections to paragraphs in the PSR, and further objecting to portions of 3 recommended special conditions of supervised release. King objected to a statement that he had not signed waivers allowing the USPO to receive medical information but did not indicate that he had any additional evaluations to share with the USPO beyond those listed in the draft PSR.

On October 31, 2024, the USPO disseminated King's final PSR. ECF No. 211. This PSR also contains a section on King's mental and emotional health. *Id.* at ¶¶ 56-64. Notably, this section now discusses an evaluation King underwent in May 2024. *Id.* at ¶¶ 61-64. The May 2024 evaluation was not previously disclosed to the government, nor was its existence acknowledged in the October 17 email containing King's objections to the draft PSR.[6]

---

[5] The 292-month sentence is the low-end of the guideline range based upon the guidelines calculated by the USPO.

[6] The government first received the May 2024 evaluation on November 5, 2024, when King's counsel emailed a copy of it to the government, noting that it was being filed under seal as an exhibit to King's sentencing memorandum.

The changes from the draft to final PSR were not limited to the section on mental and emotional health. The USPO changed its position regarding factors warranting a sentence outside the advisory guidelines, referencing in part the mental health evaluation that was not previously disclosed. *Id.* at ¶¶ 102-104. The final PSR recommended a sentence of 262 months, to be followed by 20 years of supervised release. *Id.* at p. 29.

On November 5, 2024, King filed his sentencing memorandum, asking the Court to grant what is effectively a 5-level variance, and sentence him to the mandatory minimum sentence prescribed by statute, followed by only 10 years of supervised release. ECF No. 212. King also filed objections to the guidelines calculated by the USPO. ECF No. 215. In the informal objections sent via email, King objected to the USPO's determination that he had not clearly demonstrated acceptance of responsibility. King does not renew this objection in his formal objections, *see* ECF No. 215, but he does argue in his sentencing memorandum that he should nonetheless receive credit for acceptance of responsibility. *See* ECF No. 212 at 6-19.

**APPLICABLE GUIDELINES**

The PSR correctly calculates the base offense levels for King's offenses. Count One, Coercion and Enticement is governed by U.S.S.G. § 2G1.3, which directs the use of § 2G2.1 if the resulting offense level is higher than if calculated under § 2G1.3. Count Two, Sexual Exploitation of Children, is governed by § 2G2.1. Count Four, Possession of Child Pornography is governed by § 2G2.2. All three counts are properly grouped because they involve the same victim and same act or transaction. U.S.S.G. § 3D1.2(a). Thus, the controlling provision is § 2G2.1.

Section 2G2.1 provides a base offense level of 31 for King's violation of 18 U.S.C. § 2251(a). The testimony at trial unequivocally showed that H.S. was 15 at the time King

victimized her, thus the two-level enhancement pursuant to § 2G2.1(b)(1)(B) is appropriately applied. Similarly, the uncontested evidence at trial demonstrated that King engaged in sex acts with H.S., justifying the enhancement under § 2G2.1(b)(2)(A). The government further introduced evidence that King sent CSAM to H.S. as part of his blackmail scheme. This constitutes distribution of the CSAM, warranting an enhancement under § 2G2.1(b)(3). Finally, there is no genuine dispute that King used his cellphone to interact with H.S. and induce or entice her into participating in the production of CSAM. Accordingly, the enhancement under § 2G2.1(b)(6)(B) is appropriate. The PSR correctly determined the offense level to be 40. As King's Criminal History Category is I, the Guideline range applicable to his crimes of conviction is 292 to 365 months.

**TERM OF IMPRISONMENT**

**A.    A Guidelines Sentence Is Necessary in Light of the Seriousness of King's Offense.**

The goal of sentencing is to "'impose a sentence sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed . . . correctional treatment." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (quoting 18 U.S.C. § 3553(a)). Among other factors, the Court should also consider: "the nature and circumstances of the offense and the history and characteristics of the defendant;" and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a).

Each of the crimes for which King was convicted are serious crimes. King learned early on in his conversations with H.S. that she was a freshman in high school. King used H.S.'s youth and inexperience to take advantage of her, learning her full name, her mother's name, her phone number, her address, the names and contact information for her

1  friends, and where she went to school. King proceeded to use each of these pieces of

2  information to tighten his grip over H.S. King tailored his threats to the information he

3  had, threatening to send H.S.'s images and videos to those friends for whom he had a

4  phone number, and threatening to deliver physical copies to those he could not reach

5  electronically. King used the threat of mass dissemination of her intimate images to trap

6  H.S., a fifteen-year-old child, in a position where she had no choice but to obey his

7  demands.

8      In a study conducted by the Canadian Centre for Child Protection, a non-profit

9  organization, 150 survivors of sexual exploitation were surveyed about their experiences

10  and the impacts of the crimes on their lives. *See generally*, *Survivor's Survey Full Report 2017*,

11  CANADIAN CENTRE FOR CHILD PROTECTION, available at

12  https://content.c3p.ca/pdfs/C3P_SurvivorsSurveyFullReport2017.pdf (last accessed Nov.

13  7, 2024). In that study, survivors were asked about the impacts of the recording of their

14  abuse by the abuser. Approximately two thirds of the respondents described a unique injury

15  caused by the recording, reflecting that the victims felt that the images were permanent,

16  despite an end to the hands-on abuse. *Id.* at 147-48. Victims mentioned feeling powerless

17  because they could not control whether or how far the images had been disseminated. *Id.* at

18  150-51. Others described feeling shame and humiliation tied to the recording of the abuse

19  that went beyond the shame inherent in the abuse. *Id.* at 151-52.

20      Victims were asked about the day-to-day impact of the imagery on their lives. *Id.* at

21  156. Responses revealed pervasive effects that touched all parts of the victim's life: not

22  feeling safe, receiving daily triggers, difficulty communicating with others, distrust of

23  others, poor self-image, and more. *Id.* at 156-65. The fear of being recognized was long-

24  lasting, with one half of victims over the age of 50 still concerned that they would be

recognized. *Id.* at 166. Victims described other struggles resulting from the crimes, including 95% reporting anxiety, 92% reporting sleeping difficulties, 83% reporting body image difficulties, 83% reporting suicidal ideation, 79% reporting depression, 67% reporting self-harm, and 60% reporting suicide attempts. *Id.* at 177.

Additional impacts were reported regarding all aspects of victims' lives. *See id.* at 188-95 (impacts on romantic and sexual relationships), 195-200 (impacts on parenting), 200-2011 (impacts on friendships), 211-224 (impacts on education, academic success, and employment). Ninety-one percent of respondents received at least one medical diagnosis linked to the abuse or imagery. *Id.* at 226. Many revealed a diagnosis for a trauma/stress related disorder, dissociative disorder, depressive disorder, or anxiety disorder. *Id.* at 227.

Here, the Court does not have to rely solely upon the experiences of victims involved in one study. This Court oversaw the trial and saw firsthand the impact King's crimes have had on H.S. even four years after the events. This Court heard everything King put H.S. through, and that he did so purely for his own sexual and pecuniary satisfaction. King's conduct, as revealed through the exhibits and testimony, showed that H.S. was not his only target. King repeatedly demanded information about H.S.'s teenage schoolmates, demanding names, phone numbers, and nude images. King further described why he wanted this information, stating that he was "busy looking for other girls to blackmail." Gov't Trial Exhibit 5 at 15.

It is noteworthy that while awaiting trial, King posted an online advertisement where he sought out sexual contact with a stranger. Not only was this conduct eerily similar to his behavior leading up to his victimization of H.S., but he posted the advertisement from an account that used H.S.'s email address. Moreover, King further violated his conditions of pretrial release when he was caught with an unauthorized

1    cellphone that had access to the internet, a phone he claimed he found. King's conduct

2    during the commission of the offenses and while awaiting trial for his offenses demonstrate

3    a lack of remorse and need for specific deterrence.

4        The final PSR contains a recommendation for a downward variance from the

5    guideline range. ECF No. 211 at ¶¶ 105-108. No variance is warranted. The variance is

6    based upon King's apparent diagnoses of ADHD, gambling disorder, compulsive sexual

7    behavior disorder, depression, anxiety, and impulse control disorder. *Id.* at ¶¶ 103, 107.

8    None of these diagnoses, assuming their legitimacy, are unique to King or justify his

9    behavior. According to the National Institute of Mental Health, 21 million American

10   adults have had at least one major depressive episode. *See Major Depression*, NAT'L INST. OF

11   MENTAL HEALTH, available at https://www.nimh.nih.gov/health/statistics/major-

12   depression (last updated July 2023). Another 15.5 million American adults had an ADHD

13   diagnosis in 2023. *See* Brooke S. Staley, PhD., et al, *Attention-Deficit/Hyperactivity Disorder*

14   *Diagnosis, Treatment, and Telehealth Use in Adults – National Center for Health Statistics Rapid*

15   *Surveys System, United States, October-November 2023*, MORBIDITY AND MORTALITY WEEKLY

16   REPORT, CENTERS FOR DISEASE CONTROL, Oct. 10, 2024, available at

17   https://www.cdc.gov/mmwr/volumes/73/wr/mm7340a1.htm.

18       Not only do King's diagnoses provide no justification for his crimes, at least one

19   raises concerns about his future conduct. King asserts that he is not an "ongoing danger to

20   the community." ECF No. 212 at 4. The government notes the incongruity in both that

21   "[t]here is no indication that he poses a danger to persons under the age of 17 outside the

22   specific circumstances of this offense," ECF No. 215 at 9, and blaming his actions on

23   compulsive sexual behavior disorder and addictions. In sum, King wants to both disclaim

24   responsibility for his crime by blaming it on a mental health disorder, while also claiming

that he poses no risk to anyone. Moreover, King's assertion that he will receive counseling for his now-diagnosed disorders provides this Court with little assurance. As is noted in the PSR, King stated he was seeing therapists after he was released from custody. ECF No. 211 at ¶ 56. However, after he was arrested in August 2021 for violating his pretrial release conditions, King stopped seeking any treatment, even for those diagnoses he had received. *Id.* His past practice stands in stark contrast with the claim that he "will continue to receive treatment in the BOP." ECF No. 212 at 20.

King's crimes are serious, and they are likely to have effects on H.S. that will last decades. The 292-month sentence that was originally recommended by the USPO, and that is the low-end of the applicable guideline range, is sufficient but not greater than necessary to vindicate the purposes of sentencing.

**B.    King Has Demonstrated No Actual Remorse.**

In the more than four years since he victimized H.S., King has not demonstrated or expressed any remorse, apart perhaps from regretting being caught and convicted. From the outset, King has minimized his actions and proffered excuse after excuse for his conduct. King has failed to clearly demonstrate acceptance of responsibility and is thus ineligible for any reduction.

"It is the defendant's burden to demonstrate acceptance of responsibility." *United States v. Ochoa-Gaytan*, 265 F.3d 837, 843 (9th Cir. 2001); *see* U.S.S.G. § 3E1.1(a) ("If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels."). The comments to this section make clear, "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1, comment 2.

The Ninth Circuit has held that a defendant is not required to plead guilty to qualify for a reduction under § 3E1.1(a). *See e.g.*, *Ochoa-Gaytan*, 265 F.3d at 843-44 (noting that disqualification is not automatic, and a defendant may nonetheless satisfy "sufficient contrition to merit an adjustment"). The comments also make clear that a defendant who is convicted at trial is not automatically barred from this reduction. U.S.S.G. § 3E1.1, comment 2. The comment draws the distinction between a defendant who contests factual guilt, from one who seeks to "assert and preserve issues that do not relate to factual guilt," such as challenging the statute or the application of the statute to the defendant's conduct. *Id.* When a defendant is convicted at trial, "a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct." *Id.*

The Ninth Circuit has also held that a defendant is ineligible "where he has not accepted responsibility for all counts of which he was convicted, excluding counts that cannot be grouped under the guidelines." *United States v. Green*, 940 F.3d 1039, 1045 (9th Cir. 2019) (articulating the rule coming from *United States v. Ginn*, 87 F.3d 367, 370 (9th Cir. 1996) and *United States v. Garrido*, 596 F.3d 613, 619 (9th Cir. 2010)). In *Ginn*, the Ninth Circuit stated, "[w]e agree with the Third and the Fifth Circuits that a defendant is not entitled to an adjustment when he does not accept responsibility for all of the counts of which he is convicted." 367 F.3d at 370. *Garrido* modified that approach, in limiting it to only accepting responsibility for those counts of conviction which are grouped together. 596 F.3d at 619.

### a.    King Denied Responsibility at Trial

Here, King has not accepted responsibility for any of his conduct. As noted in the PSR, all the counts of conviction are grouped together. ECF No. 212 ¶ 289. King did not plead guilty to any of these counts, and instead put the government to its burden of proof

on each of those counts. Moreover, at trial King twice moved for a judgment of acquittal.

When asked by this Court whether his arguments were limited to Count Three, King's

counsel responded that she was moving for a judgement of acquittal on all counts.

Similarly, King told the jury that he should be acquitted on all counts, arguing, among

other things, that he was unaware of H.S.'s age and thus his conduct was not unlawful.

This echoed his pre-trial statements, in which he admitted to having sex with H.S. and

some of the specific actions relating to her but claimed that their interactions were a

"roleplay" and he believed she was not a child. PSR ¶ 19.

King's defense at trial was far from the triviality described in his sentencing

memorandum. ECF 212 at 16-17. Prior to trial, King noticed two expert witnesses, one an

expert in digital forensics, the other an expert in BDSM subculture. ECF Nos. 130, 131.

The digital forensic expert was going to be used to establish that the CSAM located on

King's phones could not be shown to have been made in response to King's text-message

demands. *See* ECF No. 131. Although the expert did not testify at trial, this decision was

made only after H.S. testified that some of the images and videos she sent King were

created before she met him, and after the government's digital forensic expert testified that

some of the images and videos could not be definitively dated, though others could.

Similarly, although the BDSM expert was noticed simply to discuss general BDSM topics,

and later noticed to discuss BDSM practices among teens, ECF Nos. 131, 163, at trial the

expert testified that she expected to testify specifically about the messages between King

and H.S. King did not decide to omit the testimony about his messages, rather it was

precluded because he did not include it in his notice of experts. Moreover, the expert was

deemed not qualified to testify about three of the four topics contained in the supplemental

notice. Accordingly, the lack of substantive evidence from the experts was not due to King

accepting responsibility or contesting only the application of certain statutes to his conduct.

Beyond the evidence he sought to elicit through his own witnesses, King thoroughly cross-examined H.S., her mother, and the government's other witnesses in this case. King elicited testimony that H.S. was able to return to dance class after her victimization by King, was able to continue normal activities, and questioned H.S.'s mother whether H.S. was even upset after the events. Similarly, H.S. was questioned about how often she had been on Omegle, whether she had met other men on Omegle, and whether her other conversations on June 2, 2020, included discussions of sex. King's counsel brought out that some of the CSAM sent by H.S. to King was created by H.S. prior to meeting King. Counsel questioned H.S. about the emojis she used when she saved King's pseudonym in her phone, and whether she was truthful with him in describing her prior sexual experiences.

At the close of the government's case-in-chief, King moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The Court specifically asked King's counsel if the motion was requesting a ruling only on Count Three or on all counts, and counsel replied that the motion was made on all counts even if the argument focused on Count Three. At the close of the defense case-in-chief, King renewed his Rule 29 motion, and made no attempts to limit it to Count Three. Then in closing arguments, King did not tell the jury to find him guilty on Counts One, Two and Four, and only acquit him on Count Three. Instead, King argued, among other things, that King could not have had a reasonable opportunity to observe H.S. because she was facing away from him while he had sex with her, that he could not have known that she

1    was under 18, and questioned whether the government would require everyone to verify a

2    person's age before having sex with that person.

3    The cases upon which King relies highlight the differences between his arguments

4    at trial and the conduct that has warranted a finding of acceptance of responsibility. In

5    *United States v. Tuan Ngoc Luong*, 965 F.3d 973, 991 (9th Cir. 2020), the defendant admitted

6    his factual guilt. The defendant's only challenge to the government's case was the

7    interstate commerce theory used by the government to establish federal jurisdiction. *Id.*

8    The Ninth Circuit held that the defendant's strategy before and during trial, in which he

9    contested only the jurisdictional element, was not inconsistent with acceptance of

10   responsibility. *Id.* at 991-92. Of note, defense counsel acknowledged during closing

11   argument that a robbery occurred, acknowledged the impacts on the victim, and stated

12   only that what happened was not a *federal* offense. *Id.* at 992.

13   Similarly, in *United States v. McKinney*, after the defendant was prevented from

14   pleading guilty by the court, he offered no exculpatory evidence, and only called a single

15   witness to introduce less than three pages of transcribed testimony. 15 F.3d 849, 851 (9th

16   Cir. 1994). The Ninth Circuit deemed McKinney's case "one of the unusual cases in which

17   a defendant is entitled to an acceptance of responsibility reduction despite having pleaded

18   not guilty." *Id.* at 852. McKinney's defense was "the most minimal and perfunctory," and

19   he "did not raise an affirmative defense or even put on a witness to contest a material part

20   of the government's case." *Id.* In contrast, King contested material elements of every count

21   he faced, sought an affirmative defense, and called or attempted to call witnesses to contest

22   the government's case.

23   King's actions at trial were far from "truthfully admitting the conduct comprising

24   the offense(s) of conviction," as set forth in § 3E1.1, comment 1(a). *See United States v.*

*Decotrau*, 642 Fed. App'x 739, 741-42 (9th Cir. March 16, 2016) (unpublished) (affirming the denial of acceptance of responsibility reduction when a defendant admitted to killing the victim but claimed his conduct was not unlawful). King has failed to show that his is one of "the unusual cases" in which he is entitled to a reduction for acceptance of responsibility after pleading not guilty and putting the government to its burden.

### b.    *King Denied Responsibility Before Trial*

The Sentencing Guidelines acknowledge that a defendant may still qualify for acceptance of responsibility despite pleading not guilty and being convicted at trial. U.S.S.G. § 3E1.1, comment 2. In such a scenario, "a determination that a defendant has accepted responsibility will be based primarily upon **pre-trial statements and conduct**." *Id.* (emphasis added). Application Note 1 to that provision sets forth a non-exhaustive list of considerations including:

(A) Truthfully admitting the conduct and truthfully admitting or not falsely denying relevant conduct;

(B) Voluntary termination of criminal conduct or associations;

(C) Voluntary payment of restitution before adjudication of guilt;

(D) Voluntary surrender to authorities after commission of the offense;

(E) Voluntary assistance in recovery of the fruits or instrumentalities of the offense;

(F) Voluntary resignation from office or position held during the offense;

(G) Post-offense rehabilitation; and

(H) The timeliness of the conduct manifesting acceptance of responsibility.

*Id.* at Application Note 1. King has failed to demonstrate that his conduct supports finding any of these factors in his favor.

In the draft PSR, the only admission of conduct that is noted is not a statement directly from King. ECF No. 209 at ¶ 24. Instead, King's counsel told the USPO simply that "Mr. King accepts responsibility for the conduct described in Counts 1, 2, and 4." *Id.* This is a far cry from truthfully admitting the offense conduct. *See McKinney*, 15 F.3d at 852-53 (noting that immediately after being arrested, the defendant identified himself, told the officers where the weapon used in the robbery was located, and later confessed to the robbery and described how he acquired the weapon used).

Unlike the defendant in *McKinney*, King did not immediately confess to his crimes. The PSR describes his initial communications with officers as "evasive." ECF No. 211 at ¶ 19. Although he "eventually" admitted to some of the conduct, King nonetheless sought to excuse his actions as satisfaction of a fantasy, being part of a roleplay, and believing that H.S. was an adult. *Id.* The sole basis for King's purported belief was the fact that she was "a tall girl." *Id.* This argument, in light of the fact that H.S. had already told him she was a freshman in high school, had to be picked up from her mother's house, had been called a "teen slut" by King, and was made to state her name and her high school while King filmed her performing sex acts, is nothing short of frivolous.

Similarly, there is no indication that King voluntarily ended his criminal conduct. Less than an hour before the end of the text conversation, King demanded a "normal" picture of H.S. Government's Trial Exhibit 5, at 16. Immediately afterward, King told H.S. to provide him with a "code," the code being the security code needed to activate a Tinder or other account to traffic H.S. *Id.* Although King did not ultimately traffic H.S., there is no indication that he abandoned his plans to do so. Instead, he was thwarted by the discovery of the messages by H.S.'s mother and the involvement of the police. King's reference to a two-week cool down period also does not show an abandonment of his

crimes. When King told H.S. he would give her a two-week period to let things "cool down," it was only in response to H.S. saying that if she left the house again her mother would call the police. *Id.* at 13. King's demands for CSAM did not end with the announcement of this "cool down" period. Shortly after telling H.S. he was giving her that time, he demanded a picture of her inserting her finger into her rectum, and told her that he would send her nude pictures to her friends if she did not comply. *Id.* at 14. He also demanded that H.S. send him two-factor authentication codes she was receiving as he established online profiles for her. *Id.* at 14-15. In sum, King did not voluntarily abandon his criminal actions, instead he pivoted in response to the possibility of law enforcement involvement and turned his attention to exploiting H.S. in other ways.

The remaining factors also do not support a finding of acceptance of responsibility. King made no efforts or offers to pay restitution to H.S., did not voluntarily surrender to police, and did nothing beyond providing his passcode to assist in the location or recovery of the CSAM he created or forced H.S. to create.

Post-offense rehabilitation similarly cannot support King's claims. Although he may have sought therapy after his arrest, ECF No. 211 at ¶ 56, he still posted an advertisement seeking sexual contact with strangers after his release from custody and was later found with an unauthorized cellphone. Moreover, in the nearly three years after he was returned to custody and before trial, King has not sought out or received any counseling. *Id.* Thus his claims that he would "attend any counseling offered to him" ring hollow. *Id.*

Finally, the timeliness of his "acceptance" militates against a finding that he is entitled to a reduction under U.S.S.G. § 3E1.1. Prior to trial, King did not acknowledge his guilt or accept responsibility for his crimes. Although the parties engaged in plea

negotiations, King chose to reject the offers extended, and at no point in those negotiations

was the inclusion of Count Three identified as a determinative factor. In *McKinney*, the

defendant attempted to plead guilty to two counts before jury selection. 15 F.3d at 851.

The trial court cut McKinney off, citing concerns for delaying the proceedings. *Id.* After

jury selection but before opening statements, McKinney attempted to speak directly to the

court, expressed confusion about the status of his attempt to plead guilty, and was again

thwarted in his attempt to plead. *Id.* The Ninth Circuit highlighted these facts when

determining that he should have been given the reduction for acceptance of responsibility.

*Id.* at 852. King made no such efforts. At no time during the trial process did King attempt

to plead guilty, and the only request made shortly before trial came from King's mother,

who asked the government to reextend the offer King previously rejected, noting that she

was not sure that King would accept that offer.

King's conduct during and after the commission of the offenses and continuing

through trial do not support his contention that he has accepted responsibility for his

actions. As such, he has failed to demonstrate entitlement to his reduction. *See* U.S.S.G.

§ 3E1.1, comment 2 (noting that when a defendant proceeds to trial, "a determination that

a defendant has accepted responsibility will be based primarily upon pre-trial statements

and conduct.").

### c.    *King Has Not Accepted Responsibility After Conviction*

The draft PSR revealed a basis for King's claim of acceptance of responsibility that

came from a single sentence from his counsel, "Mr. King accepts responsibility for the

conduct described in Counts 1, 2, and 4." ECF No. 209 at ¶ 24. The final PSR expands

slightly on this indicating that King, through his attorney, provided information about his

background, sought to excuse his conduct as the result of "compulsive sexual behaviors,"

and averred that he "never intentionally sought out underage minors. . . ." ECF No. 211 at

¶ 25.[7] King reiterated his claim that he was simply exploring a fantasy. *Id.* However, as

noted above, King contested his factual guilt before and at trial. *See* U.S.S.G. § 3E1.1,

comment 1(a).

In addition to the pre-trial conduct outlined above, King still has not offered to pay

restitution, has not demonstrated substantial post-offense rehabilitative efforts,[8] and his

statement regarding accepting responsibility came only after he was found guilty at trial.

*Id.* at Application Note 1. Even accepting King's statements through counsel to the USPO

at face value, such statements came only after trial, after he put the government to its

burden of proof, after the victim testified, and after he was convicted by a jury of his peers.

*See* U.S.S.G. § 3E1.1, comment 2 (noting that when a defendant is convicted at trial, "a

determination that a defendant has accepted responsibility will be based primarily upon

**pre-trial statements and conduct**.") (emphasis added).

Moreover, King has contested, and continues to contest, not only the underlying

conduct, but also sentencing enhancements that are firmly established by the facts adduced

at trial. King asserts in his sentencing documents that he should not be subjected to the

sentencing enhancements provided for the use of a computer or based upon the age of his

victim. ECF No. 215 at 4-9. King does not and cannot genuinely contest the fact that he

used a device that constitutes a computer in the commission of his offenses. Similarly, any

---

[7] The government notes that this paragraph is an amendment from the corresponding paragraph in the draft PSR. The government is unaware of whether these statements are just drawn from the March 2024 evaluation that was provided to USPO after the draft PSR was disseminated or are based upon other communications between King's counsel and the USPO to which the government was not privy.

[8] The PSR notes that although King was attending counseling, he has not received any treatment since his arrest for violating his pretrial release conditions on August 26, 2021, more than three years before his sentencing date. PSR ¶ 55.

challenge to the fact that H.S. was under the age of 16 would be frivolous. Nonetheless, King claims that this Court should categorically reject those enhancements.

The overwhelming evidence at trial showed that King used a computer to contact H.S., demanded that she produce CSAM, received that CSAM, issued orders to H.S. backed by the threat of disseminating her CSAM, recorded and produced CSAM, and sent H.S. images he produced to ensure her compliance. King threatened to send H.S.'s images to her friends using his phone and stated he would upload the CSAM onto the internet. The only times that King threatened to disseminate H.S.'s CSAM through non-electronic means was when he did not know the recipient's phone number (H.S.'s mother), or when he wanted to reach a wide audience (threatening to post physical copies at H.S.'s high school). Given this conduct, the enhancement under U.S.S.G. § 2G2.1(b)(6)(B) is entirely appropriate.

The basis for King's argument is best summed up by the claim he made in his informal objections that it is "now the norm, not the exception for individuals to meet for sexual purposes on the internet, which requires use of a computer." However, *United States v. Kiefer* is instructive here. There, a defendant argued that applying an enhancement for using a computer constituted double counting for a conviction of receiving child pornography. 760 F.3d 926, 930 (9th Cir. 2014). The Ninth Circuit rejected this argument, citing reasoning from the Second Circuit. *Id.* at 931. Specifically, the Ninth Circuit pointed to the fact that computers have aggravated the harms associated with these crimes, have expanded the market for CSAM, and the near impossibility of removing CSAM from the internet once it has been disseminated. *Id.* (quoting *United States v. Reingold*, 731 F.3d 204, 226 (2nd Cir. 2013)). "Every other circuit court to have addressed this question has reached the same conclusion." *Kiefer*, 760 F.3d at 931 (citing cases from the Fifth, Sixth,

1    Seventh, Tenth, and Eleventh circuits).  Thus, although King chose the favorite method of

2    those seeking to sexually exploit children, he has not demonstrated a basis to remove the

3    enhancement contained in the Sentencing Guidelines and his argument to the contrary

4    simply further demonstrates that he is unwilling to accept responsibility for his actions.

5         King's argument regarding the age enhancement is similarly unavailing. After the

6    draft PSR was disseminated, King communicated a list of informal objections to the

7    USPO and the government. This list included objections to enhancements and conditions

8    of supervised release. Notably the list did not include any objection to the application of

9    U.S.S.G. § 2G2.1(b)(1)(B) despite the draft PSR including that enhancement in its

10   calculations. ECF No. 209 at ¶ 30. Local Rule 32-1 requires that a party communicate in

11   writing any objections to the PSR that will affect the recommendation by the USPO. That

12   rule specifically provides that later-raised objections are untimely and may constitute cause

13   to continue the sentencing hearing. Here, King failed to raise this objection in the time

14   provided by LCR 32-1. The first time the government learned of this objection was upon

15   receipt of the formal objection filed on November 5, 2024, five business days before the

16   sentencing. As such, it is untimely.

17        Setting aside the untimeliness of the objection, the objection is also meritless. The

18   entirety of King's argument is his claim that the enhancement based upon a victim being

19   between 12 and 16 years of age, is "arbitrary."  ECF No. 215 at 8-9. This argument ignores

20   the recognition that enhancements based upon the age of the victim account for "the

21   particular harm to and vulnerability" of children. *Kiefer*, 760 F.3d at 932 (analyzing a

22   similar provision within U.S.S.G. § 2G2.2(b)(2)). Moreover, although 18 U.S.C.

23   §§ 2251(a) and (e) criminalizes production of CSAM for minors who are 16 or 17 years

24   old, this sentencing enhancement applies only if the victim is under the age of 16. *See*

U.S.S.G. § 2G2.1(b)(1)(B). That age is significant, given that throughout the 50 States, the youngest age of consent that is not reliant upon a narrow age gap between the victim and perpetrator, is 16 years of age.[9] There is nothing arbitrary with enhancing a sentence for victimizing individuals who are deemed by law to be too young to consent to sexual activity. Not only is this enhancement appropriate, but King's contentions to the contrary undermine his supposed acceptance of responsibility.

Put simply, it is King's burden to prove that he has clearly demonstrated acceptance of responsibility, and he has failed to carry that burden. *See United States v. Dia*, 69 F.3d 291, 292-93 (9th Cir. 1995) (distinguishing between a defendant who denied all wrongdoing, pled not guilty, and maintained his innocence after trial, from a defendant

---

[9] The ages of consent are as follows: Alabama, 16, *see* AL Code §§ 13A-6-60, 13A-6-70; Alaska, 16, Alaska Stat. 11.41.434; Arizona, 18, Arizona Stat. 13-1405; Arkansas, 16, Ark. Code Ann. § 5-14-127; California, 18, Cal. Penal Code § 261.5; Colorado, 17, Col. Rev. Stat. 18-3-402; Connecticut, 16, Conn. Gen. Stat. §§ 53A-70, 53A-71; Delaware, 18, Del. Crim. Code Title 11, §§ 768, 1100; Florida, 18, Fl. Stat. 794.011; Georgia, 16, Ga. Code Ann. § 16-6-4; Hawaii, 16, Haw. Rev. Stat. § 707-730; Idaho, 16, Idaho Code Ann. § 18-1506; Illinois, 17, 720 ILCS 5/11-1.50; Indiana, 16, Ind. Code 35-42-4-9; Iowa, 16, Iowa Code 709.4; Kansas, 16, KSA §§ 21-5505, 21-5506, 21-5507; Kentucky, 16, Ky. Rev. Stat. Ann. § 510.020; Louisiana, 17, La. Rev. Stat. § 14:80; Maine, 16, Me. Crim. Code Title 17A § 254; Maryland, 16, Md. Code Ann. §§ 3-307, 3-308; Massachusetts, 16, Mass. Gen. Laws Ch. 265 § 23; Michigan, 16, Mich. Comp. Laws § 750.520e; Minnesota, 16, Minn. Stat. Ann. § 609.342; Mississippi, 16, Miss. Code Ann. § 97-3-65; Missouri, 17, Rev. Missouri Stat. § 566.034; Montana, 16, Mont. Code Ann. § 45-5-501; Nebraska, 16, Neb. Rev. Stat. § 28-319; Nevada, 16, NRS 200.364; New Hampshire, 16, NH Rev. Stat. § 632-A:3; New Jersey, 16, NJ Rev. Stat. § 2C:14-2; New Mexico, 18, NM Stat. § 30-9-11; New York, 17, NY Penal Law § 130.55; North Carolina, 16, NC Gen. Stat. § 14-27.7A; North Dakota, 17, ND Cent. Code Ann. §§ 12.1-20-03.1, 12.1-20-05; Ohio, 16, Ohio Rev. Code § 2907.06; Oklahoma, 16, Okla. Stat. Ann. Title 21 § 21-1123; Oregon, 18, Or. Rev. Stat. § 163.315; Pennsylvania, 16, 18 Pa. Cons. Stat. Ann. § 3122.1; Rhode Island, 16, RI Gen. Laws Ann. § 11-37-6; South Carolina, 16, SC Code Ann. § 16-3-655; South Dakota, 16, SD Codified Laws § 22-22-7; Tennessee, 18, Tenn. Code Ann. § 39-13-506; Texas, 17, Texas Penal Code Ann. § 21.11; Utah, 18, Utah Code Ann. § 76-5-401.2; Vermont, 16, 13 VSA § 2602; Virginia, 18, VA Code Ann. § 18.2-371; Washington, 16, Wash. Rev. Code Ann. § 9A.44.079; West Virginia, 16, W. Va. Code Ann. § 61-8B-2; Wisconsin, 16, Wis. Stat. Ann. § 948.02; and Wyoming, 18, Wyo. Stat. § 6-2-316.

1    who assisted the police in finding a weapon used in the crime, gave a full and honest

2    statement as to his actions, and attempted to plead guilty before and during trial) *citing*

3    *United States v. McKinney*, 15 F.3d 849 (9th Cir. 1994).

4    **C.    King Has Demonstrated He Remains a Danger to the Community.**

5        In addition to claiming that he thought H.S. was over 18 because she was "tall,"

6    King presents the Court with other excuses for his conduct. Far from justifying a reduced

7    sentence, the very diagnoses upon which King relies demonstrate that he is an ongoing

8    danger to the community.

9        King relies upon diagnoses for ADHD and compulsive sexual behavior disorder to

10   excuse his actions. ECF No. 212 at 2-3; ECF No. 211 at ¶¶ 61-64. According to King's own

11   argument, these conditions, which King likens to "addiction issues," caused him to engage

12   in a broad array of sexual behaviors. ECF No. 212 at 2-3. Taking King at his word about

13   his diagnoses, King's addictions demonstrate an increased, rather than decreased concern

14   for the community. "Addiction is a chronic (lifelong) condition that involves compulsive

15   seeking and taking of a substance or performing of an activity despite negative or harmful

16   consequences." *Addiction*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health

17   /diseases/6407-addiction (last reviewed Mar. 16, 2023). Many individuals combatting

18   addiction go through "cycles of recovery, relapse, and repeated treatments, often spanning

19   many years. . . ." Michael Dennis, Ph.D & Christy K. Scott, Ph.D, *Managing Addiction as a*

20   *Chronic Condition*, ADDICTION SCI. CLINICAL PRACT., Dec. 2007, at 45.

21       In the instant case, the concerns surrounding King's purported addiction are of

22   particular import. King's addictions are not tied to specific substances, and any future

23   relapse would potentially involve risky sexual behavior or the commission of new crimes.

24   King asserts that he was not actively seeking out a child when he encountered H.S. ECF

No. 212 at 4. Taking him at his word, King nonetheless engaged in profoundly harmful conduct after learning that H.S. was a 15-year-old child, simply because the opportunity to do so presented itself. Moreover, King's actions were not limited to H.S., because as described above, he demanded the names, phone numbers, and nude images of H.S.'s teenage friends. Had he received those images, he would have wielded the same power over those children that he did over H.S.

Exacerbating King's ongoing danger to the community are his actions relating to treatment. As noted in the PSR, King was released from state custody on June 26, 2020. ECF No 211 at p. 2. King was taken into federal custody on December 18, 2020, and released on December 23, 2020. *Id.* Except for those days, it appears that King was out of custody until he was arrested and detained for a pretrial violation on August 26, 2021. *Id.* According to King, during that 14-month period, he attended treatment "almost daily." *Id.* at ¶ 56. Despite this level of treatment, King violated his conditions of supervised release, posting an ad seeking sexual contact with a stranger, and possessing an unauthorized cellphone. Thus, even while undergoing treatment, King's behavior demonstrates ongoing risky sexual behavior. Further, King has spent more than three years in custody since he was detained following those violations. Throughout that time, King has not availed himself of any counseling services. *Id.* King has shown both a reluctance to utilize available counseling services, and the continuation of concerning behavior while attending counseling "almost daily." *Id.*

**D.    Sentencing Parity Considerations Mandate a Guidelines Sentence.**

Pursuant to 18 U.S.C. § 3553(a), the Court should also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." In light of the severity of King's criminal conduct, and his

failure to accept responsibility, a 292-month Guidelines sentence is more than reasonable here. It is also on par with similarly situated defendants. For example, in *United States v. Cherer*, the Ninth Circuit found that a Guidelines sentence of 293 months was reasonable for attempting to entice or coerce a minor to engage in sexual acts. 513 F.3d 1150, 1159 (9th Cir. 2008). In *United States v. Benavente*, the Ninth Circuit upheld a 360-month, mid-Guideline sentence for the sexual exploitation of two minor girls. 699 F. App'x 678 (9th Cir. 2017). And in *United States v. Stoterau*, the Ninth Circuit found that a low-Guidelines sentence was reasonable where the defendant "sexually exploited a 14-year-old boy for profit." 524 F.3d 988, 1001 (9th Cir. 2008). As just a sampling of comparable cases demonstrates, a Guidelines sentence is appropriate here to avoid giving King a windfall relative to similarly situated defendants. Accordingly, this Court should reject King's request for a variance and impose a sentence of 292-months imprisonment.

## SUPERVISED RELEASE

The PSR recommends a 20-year term of supervised release. The government respectfully submits that, given the nature of the offense and King's representations that he suffers from conditions rendering him susceptible to engaging in sexual contact with minors, a lifetime term of supervision is necessary here. The government further submits that, except where otherwise addressed in the Government's Response to Defendant's Objections, the standard and special conditions recommended by the United States Probation Office should be applied for the reasons set forth in the PSR. *See* PSR at ¶¶ 108-118.

/ / /

/ / /

/ / /

**CONCLUSION**

For the above stated reasons, the Court should impose a custodial sentence of 292 months followed by lifetime supervised release.

DATED this 7th day of November 2024.

Respectfully submitted,

JASON M. FRIERSON
United States Attorney

*/s/ Steven J. Rose*
STEVEN ROSE
Assistant United States Attorney

*/s/ Jean N. Ripley*
JEAN N. RIPLEY
Assistant United States Attorney